1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6         FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    UNITED STATES OF AMERICA,                    No. C 05-00375 SI

9              Plaintiff,                 **ORDER DENYING MOTIONS TO
                                          SUPPRESS EVIDENCE BASED ON**
10      v.                                **WIRETAP; DEFERRING RULING ON
                                          MOTION FOR BILL OF PARTICULARS**
11   ENRIQUE CHAN, et al.,

12            Defendants.
                                        /
13

14         On May 26, 2006, the Court heard oral argument on defendants' motions to suppress evidence

15   obtained pursuant to wiretap and defendant Wan's motion for a bill of particulars.  After careful

16   consideration of the parties' papers and the arguments of counsel, the Court hereby DENIES the motion

17   filed by defendants Tam and Wong, DENIES the motion filed by defendant Chan, and DEFERS ruling

18   on defendant Wan's motion for a bill of particulars until after the government has filed a superseding

19   indictment.

20

21                              **BACKGROUND**

22         This prosecution is the result of several years of disparate state investigations followed by more

23   than a year of a DEA-led investigation.  The investigation included a wide variety of investigative

24   techniques, including search warrants, use of confidential sources, physical surveillance, analysis of

25   telephone records, undercover conversations with defendant Enrique Chan and purchases from him, and

26   ultimately Title III surveillance.  AUSA Scoble supervised the investigation, dubbed "Urban Harvest,"

27   and he supervised the preparation of a wiretap application, affidavit and order.  *See* Scoble Decl. ¶ 2.

28   Scoble worked with an attorney at the U.S. Department of Justice's Office of Enforcement Operations

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

("OEO"), charged with reviewing wiretap applications and obtaining authorization from the appropriate D.O.J. official. *Id.* On April 14, 2005, the government obtained the authorization memorandum, which was signed on April 12, 2005 by Deputy Assistant Attorney General Bruce C. Swartz of the Criminal Division. *Id.*

On April 14, 2005, the government submitted the application materials and a proposed order to the supervising judge, Judge Patel. *Id.* at ¶ 3 & Ex. A. Judge Patel held *in camera* sessions with AUSA Scoble and the affiant, DEA Special Agent Christopher Fay, on April 19, and with Scoble, Fay, and Special Agent Brown on April 20, 2005. The *in camera* transcripts are attached to the Scoble declaration at Exhibit D, beginning with Bates No. 3077. During the sessions, Judge Patel sought clarification and additional information about the investigation that had been conducted thus far, and in particular, about whether other investigative techniques such as the continued use of undercover agent Brown might lead to the information sought by the wiretap.

At the close of the second session on April 20, 2005, Judge Patel stated that she was satisfied with the application, and signed the order, application, and affidavit. Judge Patel made interlineations in the affidavit and order, reflecting her consideration of the agents' sworn responses to her questions. The application was unchanged. *Id.* at ¶¶ 3, 5(b) & Ex. F, G, and H.

AUSA Scoble did not file the signed wiretap materials on April 20, and instead decided to wait for the transcripts of the *in camera* proceedings so they could be attached to the wiretap application. Scoble re-submitted the wiretap materials, with the *in camera* transcripts, on April 25, 2005. Judge Patel signed the documents again, and they were filed on that same day.

According to Scoble's declaration, prior to re-presenting the wiretap materials, Scoble contacted the OEO attorney to explain that the application materials were going to be re-presented, and to ensure that no new authorization was required. OEO advised that no new authorization was necessary because the showings of probable cause and necessity had been expanded. *Id.* ¶ 6.

By order signed May 24, 2005, Judge Patel authorized an extension of the interception period for up to 30 days. Between the two wiretap authorization orders, a total of 39 individuals were named as possible interceptees of the Court-authorized wiretap. On May 24, 2005, the government sought authorization, which Judge Patel granted, for continued interception of wire communication to and from

2

Chan's cellular telephone.

On June 16, 2005, a federal grand jury returned a sealed indictment against a total of 20 individuals. Count One of the indictment charged 19 defendants with conspiring, between approximately January 2001 and June 16, 2005, to cultivate and traffic in one thousand or more marijuana plants in violation of 21 U.S.C. § 846. Count Two of the indictment charged several defendants with conspiring to possess with intent to distribute and distribute MDMA (ecstasy) in violation of 21 U.S.C. § 846. Count Three charged 2 defendants with conspiring to engage in money laundering in violation of 18 U.S.C. § 1956(h).

On June 22, 2005, government agents executed 23 federal search warrants at locations in San Francisco, South San Francisco, San Jose, Santa Clara, and San Bruno. The search warrants encompassed 13 residences, seven businesses, and four marijuana grow sites. The following day, a twenty-fourth federal search warrant was executed at a storage facility in Alameda, California.

On or about October 13, 2005, a federal grand jury returned a superseding indictment which added defendant Vince Ming Wan to Count One (conspiring to cultivate, to possess with intent to distribute, and to distribute 1,000 or more marijuana plants). The superseding indictment also extended the date of the alleged conspiracy to include the date on which the 23 federal search warrants had been executed, June 22, 2005.

 Now before the Court are the following motions: (1) a motion to suppress evidence obtained pursuant to the April 25, 2005 wiretap order, filed by defendants Iris Tam and Richard Wong on behalf of all defendants, based on facial invalidity of the wiretap application; (2) a motion to suppress evidence obtained pursuant to the April 25, 2005 wiretap order, filed by defendant Enrique Chan on behalf of all defendants, based on alleged *Franks* violations; and (3) a motion for a bill of particulars, filed by defendant Vince Ming Wan and joined by some but not all defendants.

## DISCUSSION

### 1.     Motion to Suppress Evidence Filed by Defendants Tam and Wong

Defendants Tam and Wong have filed a motion to suppress evidence obtained pursuant to an April 25, 2005 wiretap based on facial insufficiency of the application. Most, but not all, defendants

3

join the motion. Defendants contend (1) the application was unlawful within the meaning of 18 U.S.C. § 2518(10)(a)(i) because the application was not authorized by an appropriate Department of Justice official; and (2) the wiretap application and supporting affidavit failed to establish a factual showing of necessity as required under 18 U.S.C. § 2518(5), and was therefore facially insufficient within the meaning of 18 U.S.C. § 2518(10)(a)(ii).

**A.      Review or Approval of Initial Wiretap Application by Appropriate Department of Justice Official**

Defendants contend that the wiretap application ultimately endorsed by Judge Patel on April 25, 2005, and the resulting order, are "unlawful" under 18 U.S.C. § 2518(10)(a)(i) because the final version of the application had not been reviewed or approved by an appropriate official at the Department of Justice. Defendants argue that because the letter from D.O.J. authorizing the wiretap application only approved the initial April 12, 2005 wiretap application, and not the revised April 25, 2005 application, that letter does not constitute authorization under the statute. Defendants do not cite any provision of the wiretap statute that requires the government to seek reauthorization after authorization has been obtained.

18 U.S.C. Section 2516 provides in relevant part:

Authorization for interception of wire or oral communications.

(1)   The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made.

18 U.S.C. § 2516(1). Section 2518 provides for suppression of evidence on the following grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i)-(iii).

Defendants contend that there is "grave doubt" that the Department of Justice officials had enough information regarding the Northern District U.S. Attorney's revised wiretap applications to make an informed judgment as to whether the wiretap was necessary. Defendants contend that the

4

United States District Court

For the Northern District of California

1    government made extensive revisions to the application, producing at least three separate versions of

2    the affidavit, after the earlier version was delivered to the Department of Justice for review, and that the

3    revisions were potentially material to the Attorney General's decision on the Northern District U.S.

4    Attorney's wiretap request.

5         Defendants contend that the information added to the wiretap application after the initial

6    authorization might have impacted the Attorney General's determination whether the Chan investigation

7    really required, or justified, a wiretap.  According to defendants, the additional information consisted

8    of the following: (1) that Chan had been attempting to contact Agent Brown, that he trusted Brown, that

9    Brown was not in danger of blowing his cover, and that the government had no idea how long it would

10   take for Brown to insinuate himself into the group to gain introductions to Chan's associates; (2) that

11   Brown and Agent Fay's estimations of the likelihood or lack of success of the undercover operations

12   were based primarily on their opinions; (3) that the so-called Chan organization was perhaps not a very

13   cohesive group; (4) that there had been numerous arrests of alleged members of the conspiracy as a

14   result of marijuana busts, that local officials had decided not to prosecute these cases, but that there was

15   no explanation for the U.S. Attorney not to prosecute these cases; (5) that the U.S. Attorney did not

16   attempt to obtain cooperators from the marijuana busts because the government wanted more serious

17   charges; (6) that though the application listed ecstasy trafficking as a target offense, at his recent

18   meetings with undercover agents Chan had indicated he was not interested in or participating in ecstasy

19   deals; (7) that the government could arrange a drug transaction involving Chan, but had chosen not to

20   based on agent Fay's belief that Chan would not cooperate after being busted; (8) that the government

21   had probable cause sufficient to obtain a warrant for Chan's house but chose not to search; (9) that agent

22   Brown had not followed up on his meetings with Chan, or Chan's recent phone calls, because "we [the

23   government] don't know where we're going with the investigation"; and (10) that the government's

24   assertion that Chan and Wan were co-conspirators was based in part on information that they knew each

25   other and "all socialize together."

26        The government responds that there is no question that a duly empowered D.O.J. official,

27   identified by name in the application and wiretap order, authorized the wiretap application on April 12,

28   2005.  The government also notes that 18 U.S.C. § 2518(2) authorizes the supervising judge to "require

the applicant to furnish additional testimony or documentary evidence in support of the application," and that the information provided to Judge Patel during the *in camera* proceedings largely clarified information already contained in the original affidavit.[1]

The parties agree that the issue presented by defendants' motion is one of first impression in the Ninth Circuit. At least one district court has held that changes in affidavits after approval by the D.O.J. official do not warrant suppression. *See United States v. Eiland*, 398 F. Supp. 2d 160, 175 (D.D.C. 2005). In *Eiland*, after the D.O.J. approved various wiretap applications, the government made changes to affidavits prior to submitting them to the judge. The court rejected the defendants' argument that making these changes violated Section 2518, holding "there is no indication that doing so even constituted a violation of the statute or, if it did, that it warrants suppression of the evidence." *Id.*

This Court agrees that there is nothing in the wiretap statute that requires the government to seek reauthorization after changes are made to an application or supporting affidavit. The Court finds that the wiretap order complies with Section 2516 because there is no question that a duly-empowered D.O.J. official authorized the wiretap application on April 12, 2005. The wiretap order is not insufficient on its face, as it lists the identity of the authorizing officer. *See United States v. Chavez*, 416 U.S. 562, 573-74 (1974).

Moreover, while there may be situations in which it might be prudent to obtain reauthorization from the D.O.J. – such as when a significant period of time elapsed or there are important factual developments after authorization – that is not the case here. The D.O.J. authorized the wiretap application on April 12, 2005, and Judge Patel signed the wiretap application, affidavit and order soon thereafter on April 20, 2005 and again on April 25, 2005. Additionally, a review of the *in camera* transcripts belies defendants' assertions that the Fay affidavit was substantially revised. Throughout the *in camera* proceedings, Judge Patel asked questions seeking clarification or further detail regarding

---

[1] In addition, according to Scoble's Declaration, prior to re-submitting the wiretap application materials, he spoke to the OEO attorney to determine whether a new authorization was required, and he was advised that no new authorization was required because the affidavit enhanced the showings of probable cause and necessity which had already been approved with a lesser showing. Scoble Decl. ¶ 6. Scoble states, "I believe that I had this conversation with the OEO attorney prior even to contacting the supervising judge on April 22, 2005; I am certain that I had the discussion, and received the advice that no new authorization was required, before the April 25, 2005 Application, Affidavit and Order were signed." *Id.*

United States District Court

For the Northern District of California

matters apparently set forth in the initial affidavit.  As Judge Patel herself noted about the revised affidavit, "Generally, there haven't been wholesale changes or things like that, as there are [in] some cases.  Generally, it's just been a few little intricacies here and there."  April 20, 2005 RT at 3:12-15 (Bates No. 3115).

Finally, the Court finds it significant that to the extent information was added to the Fay affidavit, that information only appeared to buttress the necessity of the wiretap.  For example, Fay added Paragraph 175(a) regarding the limitations of using undercover agents and explaining why further use of undercover agents would not reveal information sought by the wiretap.  It appears that this general information was contained in the initial affidavit, as evidenced by Judge Patel's questioning during the first *in camera* session; Paragraph 175(a) provided additional details regarding explaining Agent Fay's belief that further use of undercover agents would not prove fruitful.

The cases cited by defendants do not compel a contrary result.  These cases hold that suppression is required when a wiretap application is approved by someone who lacks statutory authority, *see United States v. Giordano*, 416 U.S. 505, 527 (1974), or when the government secures D.O.J. authorization *after* the wiretap order is signed, *see United States v. Reyna*, 218 F.3d 1108, 1112 (9th Cir. 2000).  In contrast, courts have held suppression is not required when, despite errors or "technical" violations of the statute, a person with authority actually authorized a wiretap application prior to approval by a court. *See, e g., United States v. Chavez*, 416 U.S. 562, 573-74 (1974) (application incorrectly identified Assistant Attorney General as authorizing official when Attorney General actually authorized; both had statutory authority);  *United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005) (application silent as to who authorized, but actually approved by someone with authority); *United States v. Swann*, 526 F.2d 147, 149 (9th Cir. 1975) (per curiam) (individual lacking statutory authority identified when Attorney General actually authorized).  Here, defendants have not identified any error or "technical" violation of the statute, and more importantly, there is no dispute that a D.O.J. official with statutory authority approved the wiretap application before it was submitted to Judge Patel.

### B.    Facial Sufficiency of Application and Affidavit re: Necessity

Defendants contend that the April 2005 wiretap applications and affidavit were facially deficient

United States District Court

For the Northern District of California

because they failed to set forth sufficient factual support to establish necessity for the wiretap.[2]  In general, defendants contend that the investigatory goals as set forth in the wiretap application were overly broad and unrealistic, that the government should have pursued various investigative techniques further, and that the government improperly relied on boilerplate assertions by the investigating agents.

"Courts are required to interpret the necessity requirement in a practical and common sense fashion."  *United States v. Smith*, 893 F.2d 1573, 1582 (9th Cir. 1990).  A reviewing court reviews *de novo* whether the wiretap application is supported by a full and complete statement of facts in compliance with 18 U.S.C. § 2518(c).  *See United States v. Staves*, 383 F.3d 977, 980 (9th Cir. 2004).  If it was, the court reviews for an abuse of discretion the decision that the wiretap was necessary.  *Id.*

Before turning to defendants' specific assertions that various investigative techniques should have been pursued further, the Court first addresses defendants' general contention that the government's stated goals were overly broad and unrealistic.  Defendants contend that by widely framing the goals of the investigation, the government was able to manipulate Judge Patel's necessity finding because no traditional investigative method would have been able to achieve such "monumental" goals.

The Court disagrees, and finds that the stated goals of the investigation were appropriate and supported by Ninth Circuit case law.  The stated goals included to:

> Identify, and determine the respective roles of, all co-conspirators, accomplices, and aiders and abettors and all the sources of supply of the controlled substances;

> Identify the methods of operation of this organization, including hierarchy, chain of command, and means of communications instructions;

> Identify the acquisition and distribution network used by Enrique CHAN, Vince Ming WAN, and the other Anticipated Interceptees;

> Identify the conspirators, financiers, managers, and supervisors, and the precise nature and scope of the illegal activities, and allowing for successful prosecution of all the targets of the investigation; and

> Obtain admissible evidence of the commission of the offenses . . . and proof beyond a reasonable doubt of the intent of each of the participants to join and participate in the conspiracy knowingly and willingly.

---

[2]  On May 24, 2005, the government sought authorization, which Judge Patel granted, for continued interception of wire communication to and from Chan's cellular telephone.  None of the present motions challenge that extension.

April 25, 2005 Aff. 22-25. In addition, during the *in camera* proceeding before Judge Patel, AUSA Scoble stated that the government sought "to attack the conspiracy as a whole and not try to take it apart one grow site at a time." April 19, 2005 RT at 11:4-6 (Bates No. 3086).

The Ninth Circuit has repeatedly approved similar investigative goals set out in wiretap applications in the conspiracy context. In *United States v. Canales Gomez*, 358 F.3d 1221 (9th Cir. 2004), the court affirmed a wiretap order in a drug conspiracy investigation in which the government sought to identify the "full scope of the massive conspiracy under investigation," and to "obtain direct evidence that will convince a jury beyond a reasonable doubt of its existence." *Id.* at 1224; *see also United States v. Bennett*, 219 F.3d 1117, 1121 n.3 (9th Cir. 2000) (wiretap needed to discover "full scope" of conspiracy); *United States v. Brone*, 792 F.2d 1504, 1505, 1506 (9th Cir. 1988) (affirming authorization of wiretap to "enable the agents to uncover the source of [the defendant's] narcotics or the modus operandi of the alleged conspiracy" and to "develop an effective case.").

More specifically, the investigation in *Canales Gomez* sought to "reveal the key personnel of the narcotic trafficking conspiracy, the identity of the main customers of the identified conspiracy, the stash locations where cocaine was stored prior to distribution, and the management and disposition of financial proceeds generated by the organization's cocaine trafficking." *Canales Gomez*, 358 F.3d at 1224. The court held that the 38-page affidavit in support of the wiretap application adequately explained that the interception of wire communications was "the *only* way to identify and investigate the whole of the network, including the entire hierarchy of suppliers, transporters, distributors, customers, and money launderers." *Id.* at 1225 (emphasis in original). Just as in *Canales Gomez*, the Court finds that the investigative goals set forth in Fay's affidavit are appropriate, particularly given the practical considerations of investigating a conspiracy. *See United States v. McGuire*, 307 F.3d 1192, 1197-98 (9th Cir. 2002).

With respect to defendants' assertions that specific investigative techniques should have been pursued further, the Court concludes that Agent Fay's 131-page affidavit, with the incorporated *in camera* transcripts, provides a full and complete statement of facts in compliance with the wiretap statute, and further, that Judge Patel did not abuse her discretion in concluding that the wiretap was necessary. Fay's affidavit describes in considerable detail how, prior to applying for a wiretap,

United States District Court

For the Northern District of California

investigators had used or contemplated using each of the following traditional techniques: confidential informants; physical surveillance; pen registers and telephone tolls; trash searches; undercover agents; financial investigations; search warrants; interviews; and grand jury subpoenas. The affidavit detailed why each of these techniques, alone and in combination, would be unsuccessful at identifying the full scope of the alleged conspiracy under investigation.

Fay noted, for example, that although the six confidential informants had provided a good deal of information about the alleged conspiracy, the knowledge of each informant was limited to a particular aspect or aspects of the conspiracy, and none of the informants could provide information about the full scope of the conspiracy. Fay Aff. at 100-05. The four confidential sources who appeared to have direct access to one or more high-ranking members of the alleged conspiracy (CS#1, CS#2, CS#3, and CS#6) were no longer willing to participate in the investigation,[3] and each had refused current requests to introduce an undercover agent to the investigation. *Id.* at 101. Fay also noted that investigators had reason to question the credibility of CS#2 and only relied on his/her information to the extent it could be corroborated, *id.* at 104; CS#4 did not profess to have first-hand information, it was unclear whether the hearsay information provided by CS#4 pertained to the alleged conspiracy, and CS#4 had been unwilling or unable to meet with Fay to enable Fay to follow up on a lead, *id.*; and CS#5 was willing to testify, but could only testify regarding a Steven Lance Berry (not charged in this case) and Berry's dealings with a "Nelson" (believed to be defendant Wan) and "Max" (believed to be defendant Fong). CS#5 had not been able to identify Wan from a photo spread. *Id.* at 104-05.

Fay provided similarly detailed information regarding why further use of undercover agents was unlikely to result in obtaining the information sought. Fay stated that although Chan appeared to trust undercover agent Brown, Chan had always met with Brown alone,[4] never offered to introduce the agents to his associates, generally referred to "my partners," and only on one occasion referred to a partner by name as "Jason" (believed to be defendant Jason Lee). Fay states in his affidavit that Brown

---

[3] Defendant Chan's contentions regarding CS#3 are discussed *infra*.

[4] As discussed *infra*, the fact that Chan brought a woman with him to an April 28, 2005 meeting with Brown, which occurred after Judge Patel signed the wiretap order, is irrelevant.

told him that although Brown believed Chan was comfortable enough with him to discuss criminal activity, especially plans for money laundering, the relationship was not sufficiently close for Brown to press for names or other details of the conspiracy. *Id.* at 98-99.

Defendants assert that the government's need for a wiretap was undermined by the fact that CS#2 offered to introduce a particular Oakland Police Department officer to defendant Wan as a supposedly corrupt police officer. However, Fay's affidavit explained that the government had considered and rejected that proposal for the following reasons: (1) the officer in question refused to undertake the assignment due to his fears for his own safety and that of his family; (2) CS#2 was only willing to introduce the particular officer in question, and was unwilling to introduce any other police officer to Wan; and (3) the government feared that use of the Oakland Police Department officer would have required disclosure of his identity and led to the disclosure of CS#2. *Id.* at 97, 101; Scoble Decl. ¶ 15(b). Moreover, Fay's affidavit presented evidence suggesting that Chan and his associates took steps to identify informants and might use violence against them. *Id.* at 52-53, 60.

Defendants also assert that the government could have made more use of search warrants, and that there was no need for a wiretap because, prior to the wiretap, the government already "could implicate Chan and Wan," and had "succeeded in identifying and arresting virtually all of Chan and Wan's underlings." Motion at 34. However, as Fay's affidavit explained, although search warrants and other investigative tools had uncovered considerable information about the alleged conspiracy, none of the techniques had provided a complete understanding of the hierarchy and chain of command, the identification of other co-conspirators who were involved with defendants in the smuggling and trafficking of narcotics, the means or locations where the narcotics were cultivated and packaged, or the identifies of all of those responsible for laundering of proceeds derived from smuggling and trafficking. *See e.g, id.* at 95.

Defendants' reliance on *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001), is unavailing. In *Blackmon*, the Ninth Circuit suppressed wiretap evidence because the wiretap application contained material omissions and misstatements that, when purged, left a deficient application. *Id.* at 1211. Here, as discussed in section 2 *infra*, the Court rejects defendant Chan's contentions that the Fay affidavit suffered from any such omissions or misstatements. Accordingly, *Blackmon* is inapposite.

In sum, the Court concludes that there was more than a sufficient basis to support Judge Patel's finding that a wiretap was necessary. In reaching this conclusion, the Court is instructed by the Ninth Circuit's decisions in *Canales Gomez* and *United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000). In *Canales Gomez*, the government appealed from the district court's order suppressing evidence obtained from court-authorized wiretaps in connection with the FBI's investigation of a large drug-trafficking operation. The district court held that the affidavit lacked an adequate explanation regarding the use of confidential informants, finding that because confidential informants had provided much of the investigation's preliminary information, it was unclear why the continued use of these informants would be unsuccessful. 358 F.3d at 1225.

The Ninth Circuit reversed. The court held, *inter alia*, that the government had sufficiently explained why, in light of the "broad goals" of the investigation, traditional investigative techniques were unlikely to result in the necessary information. *Id.* at 1226. The court noted although informants had provided information helpful to the investigation, the informants were unaware of the full scope of the conspiracy and would have been unable to provide timely, comprehensive information regarding current trafficking operations. *Id.* at 1225. The *Canales Gomez* court emphasized that the "mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." 358 F.3d at 1225 (quoting *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2001)).

In *Bennett*, defendants challenged a wiretap issued in a drug conspiracy investigation arguing, *inter alia*, that the government failed to demonstrate necessity. 219 F.3d at 1119. The wiretap application and affidavits stated that despite the government's use of physical surveillance, pen registers, toll records, and monitoring of hand-to-hand drug sales, investigators were unable to "determine the full scope of the drug-trafficking conspiracy," and "lacked knowledge of [a defendant's] drug suppliers and major customers." *Id.* at 1120. The defendants challenged the wiretap by pointing the degree of success the government had achieved using traditional methods, and they argued that the continued use of those or other methods, such as use of an informant, would have sufficed, or at least should have been given a chance to succeed. *Id.* at 1122.

The Ninth Circuit rejected that argument. "We have consistently held that the wiretap statute

United States District Court

For the Northern District of California

does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may become alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." *Id.* The court noted that specifically with respect to the informant at issue, although he was able to purchase drugs from one of the defendants, he was unable to penetrate the organization and thus could not provide the information sought. *Id. See also United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002) ("[W]e have consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators.") (internal quotations and citations omitted).

Here, just as in *Canales Gomez* and *Bennett*, the government submitted an extremely detailed affidavit explaining why none of the traditional investigative techniques would uncover the full scope of the alleged conspiracy. Defendants' arguments challenging Judge Patel's necessity finding are similar to those rejected in *Canales Gomez* and *Bennett*, and, just as in those cases, the Court concludes that investigators were not required to exhaust every other investigative technique prior to seeking a wiretap, particularly when none of the other techniques were likely to uncover the full scope of the alleged conspiracy.

## 2.      Motion to Suppress Filed by Defendant Chan

Defendant Chan has filed a separate motion to suppress, joined by almost all defendants, arguing that the affidavit in support of the wiretap application contained numerous intentional or reckless omissions and misstatements which were material to Judge Patel's determination that a wiretap was necessary. Chan contends that when those omissions and misstatements are taken out of the analysis, there is no basis for Judge Patel's necessity finding. Alternatively, Chan seeks a *Franks* hearing.

### A.      Legal Standard under *Franks v. Delaware*

A defendant seeking to challenge the truthfulness of a wiretap affidavit must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is

2    necessary to a finding of probable cause," then suppression is warranted.  *Franks v. Delaware*, 438 U.S.

3    154, 155-56 (1978).  The necessity requirement of Title III is "material to the issuance of a wiretap

4    order," and thus is subject to a *Franks* analysis.  *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir.

5    1985).

6        A defendant seeking an evidentiary hearing regarding misstatements and omissions must satisfy

7    five requirements: "'(1) the defendant must allege specifically which portions of the warrant affidavit

8    are claimed to be false; (2) the defendant must contend that the false statements or omissions were

9    deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the

10   allegations; (4) the veracity of only the affiant must be challenged; (5) the challenged statements must

11   be necessary to find probable cause."  *United States v. Perdomo*, 800 F.2d 916, 920 (9th Cir. 1986)

12   (quoting *United States v. DiCesare*, 765 F.2d 890, 895 (9th Cir. 1985)).

13       Further, even if a statement is deemed intentionally or recklessly false, it must still be found

14   "material" to satisfy the *Franks* standard.  "False statements are material if the wiretap application,

15   purged of the false statements would not support findings of probable cause and necessity."  *United*

16   *States v. Staves*, 383 F.3d 977, 982 (9th Cir. 2004).

17

18       **B.    Alleged Omissions/Misstatements**

19       Before turning to the specific issues raised by defendant's motion, the Court notes that

20   defendant's motion relies places substantial reliance on an April 28, 2005 meeting between Chan and

21   Special Agent Brown.[5]  This meeting occurred *after* the government submitted its wiretap application

22   and Fay's affidavit, and *after* Judge Patel signed the wiretap order.  Accordingly, to the extent that

23   defendant argues that the government made material misrepresentations of fact based upon the April 28,

24   2005 meeting – such as pointing to Fay's statement that Chan never brought anyone with him to

25   ───────────────

26       [5]  Defendant confusingly refers to this meeting as the April 28/March 11 meeting, stating that
     references in the Fay affidavit to a March 11, 2005 meeting are in error and actually refer to an April

27   28, 2005 meeting.  In fact, these are two different meetings.  The March 11, 2005 meeting between
     Special Agent Brown and Chan occurred at Houston's Restaurant, *see* Scoble Decl. Ex. N, and the April

28   28, 2005 meeting between Special Agent Brown and Chan occurred at Kincaid's restaurant, *see* Def's
     Ex. G; *see also* Scoble Decl. ¶¶ 12-13.

1    meetings with undercover agents, and arguing this is untrue because Chan brought a woman with him

2    to the April 28, 2005 meeting[6] – those arguments lack merit.

3

4              **(1)     Misstatements concerning the past and potential effectiveness of the use of
                         undercover agents**

     Defendant generally asserts that the government downplayed the effectiveness of the use of

5    undercover agents in the following ways: (1) understating the level of trust Chan had in the undercover

6    agents; (2) misstating the undercover agents' level of access to information regarding alleged co-

7    conspirators; (3) aggrandizing Chan's activities as an MDMA distributor and money launderer, thereby

8    purposefully understating the value of undercover operations; (4) stating that there was an alleged

9    conspiracy, when in fact there was no evidence of a conspiracy; and (5) omitting information about

10   Chan's involvement with medical marijuana clinics.

11        The Court notes that, although styled as a *Franks* challenge, defendant's motion really just

12   disagrees with Judge Patel's necessity finding.  Defendant has not demonstrated that the government

13   misstated or omitted material information.  Instead, defendant contends that the evidence before Judge

14   Patel did not support a finding that the wiretap was necessary.  For example, in arguing that the

15   government understated the level of trust Chan had in the undercover agents, defendant does not point

16   to any material misstatements or omissions; indeed, he relies on information contained in the Fay

17   affidavit (*see, e.g.,* Motion at 12:23, 13:07, 13:14-15, 14:02, 14:05, *citing* Fay Aff. at 69-82, 98-99), or

18   information obtained from the April 28, 2005 undercover meeting that occurred *after* the wiretap

19   application was submitted and signed by Judge Patel.  *See, e.g.*, Motion at 12:25, 14:01, 14:08, *citing*

20   April 28, 2005 transcript.

21        Similarly, defendant makes much of the fact that, on April 13, 2005, shortly before the

22   government submitted the wiretap application to Judge Patel, Chan left Agent Brown a voice mail

23   message asking Brown to contact him, and Brown had not returned Chan's phone call.  However, these

24   facts were disclosed to Judge Patel, and during the April 20, 2005 *in camera* proceeding Judge Patel

25   questioned Agent Brown about this matter specifically, and about the more general question of whether

26

27   ───────────────

28        [6] This is just one example of many alleged misstatements or omissions that Chan cites based
     upon the April 28, 2005 meeting.

United States District Court

For the Northern District of California

1    further undercover work would be likely to achieve the goals of the investigation.

2         Defendant also contends that Fay "lied" by stating, "in his contacts with the undercover agents,

3    CHAN has never identified his partners and coconspirators" because, in fact, Chan told the agents that

4    he had a partner named "Jason." Fay Aff. at 96. However, the very next sentence of Fay's affidavit

5    states,

6         At the July 9, 2004 meeting, he referred to a partner named "Jason" but did not otherwise
          identify "Jason." At the October 12, 2004 meeting, CHAN discussed bulk cash
7         smuggling and other forms of money laundering, and referred to the need for him to
          consult with his "partners" – again, without identifying them. . . .

8    *Id.* at 96-97. Thus, contrary to defendant's assertions, the government disclosed the facts to Judge Patel,

9    and she concluded that a wiretap was necessary. As the Court concluded *supra*, there was more than

10   a sufficient basis for Judge Patel's finding.

11        Chan also argues that there was no evidence that Chan was a money launderer for the Wan Drug

12   Trafficking Organization ("DTO"), that Fay omitted to state that Chan was allegedly involved in the sale

13   of marijuana to medical marijuana dispensaries, and that the government mischaracterized him as an

14   MDMA distributor. These assertions are contradicted by the detailed allegations in Fay's affidavit

15   regarding Chan's alleged money laundering, and connections between Chan and Wan, *see* Fay Aff. at

16   60, 69-80, 90-91; statements in the affidavit regarding Chan's alleged involvement with medical

17   marijuana dispensaries, *id.* at 80; and statements in the affidavit linking Chan to MDMA distribution.

18   *Id.* at 73, 78, 80-81. The Court further notes that Chan's arguments regarding the lack of "direct

19   evidence" that he was a money launderer for the Wan DTO go to probable cause, not necessity, and thus

20   are largely irrelevant for purposes of the instant motion.

21        Finally, to the extent that Chan raises specific arguments challenging either the goals of the

22   investigation, or contending that traditional investigative techniques would have sufficed, the Court has

23   addressed those matters *supra*. Moreover, as the Ninth Circuit has repeatedly held, "[l]aw enforcement

24   officials need not exhaust every conceivable investigative technique before seeking a wiretap order."

25   *Staves*, 383 F.3d at 982; *see also United States v. McGuire*, 307 F.3d 1192, 1196-97 (9th Cir. 2002).

26

27

28
          **(2)    Misstatements and omissions concerning information provided by
                   confidential source #3, true name Donald Heu**

16

United States District Court

For the Northern District of California

1    Defendant has submitted the October 22, 2005 Declaration of Donald Heu, also known as

2    Confidential Source #3.  *See* Ex. H in Support of Chan's Motion to Suppress.  Relying on Heu's

3    declaration, Chan contends that Fay's affidavit falsely reported that CS#3 stated that he had visited a

4    marijuana grow site in San Francisco with Chan; that Chan sold marijuana for $2800 per pound; that

5    CS#3 ever refused to cooperate; that Chan had recruited CS#3 to sell MDMA in Hawaii; and that CS#3

6    had an arrest for possession of a dangerous weapon in 1995.  Heu's declaration also states that he

7    informed the government agent that Chan was a medicinal marijuana provider, but that Fay's affidavit

8    omitted that information.

9        In response, the government has submitted the Declaration of Brett Shavers, an undercover

10   police officer from the Renton, Washington Police Department who dealt with Heu.  Mr. Shavers'

11   declaration describes the manner in which Shavers first approached Heu for cooperation, and confirms

12   Fay's affidavit on many of the points listed above.  Specifically, Shavers states that Heu told him: (1)

13   he had been in one of Chan's "marijuana grows" somewhere in the south of San Francisco, Shavers

14   Decl. ¶ 5; (2) he went with Chan on several occasions to Canada to pick out shipments of packaged

15   marijuana, which would then be delivered by someone else to the U.S., *id.*; (3) he was planning on

16   moving to Hawaii, and Chan had asked him to be his MDMA dealer in Hawaii, selling up to 10,000 pills

17   at a time, *id.*; and (4) he repeatedly stated that Chan was his friend and that he did not want Chan to be

18   prosecuted, *id.* at ¶ 6.  Shavers has also attached a memo and telephone log chart that he compiled in

19   May 2005 corroborating his version of events.  The government acknowledges that it did err by stating

20   in the Fay affidavit that CS#3 had been arrested in 1995; that arrest apparently belonged to Chan, not

21   CS#3.

22       The Heu declaration does not demonstrate a *Franks* violation, nor does it provide a basis for a

23   *Franks* hearing.  Assuming arguendo that the Heu declaration is true and that defendant has met the high

24   burden to show that false statements about Heu were intentionally or recklessly included in the Fay

25   affidavit, even if those statements are purged from the affidavit there is still more than enough

26   information to support both probable cause and necessity.  Much of the information attributed to CS#3

27   was contained elsewhere in the Fay affidavit.  With respect to probable cause, Heu and Chan do not

28   dispute that Heu passed on Chan's request that Detective Shavers find one or more nominee lessees for

Chan's grow sites; this information was corroborated by a subsequent recorded phone call between Chan and Shavers on the subject. Fay Aff. at 74-75. Similarly, the affidavit reported Chan's own statements that one of his indoor grow sites had recently been discovered and seized, *id.* at 76, and that all of the marijuana he now sold was grown locally, *id.* at 80. Fay's affidavit recited Chan's statement to undercover agent Brown that he sold his marijuana on the streets and in medical marijuana clubs, that he sold between Los Angeles and San Francisco, that he got a better price on the street, and that he sold his marijuana for $3000 per pound. *Id.* With respect to MDMA, Fay's affidavit recited Chan's statements on July 9, 2004 about MDMA use by females and his December 9, 2004 telephone response to Shavers' query about "E," followed by his statement to undercover agent Brown that he "was still able to acquire multi-thousand tablet quantities of MDMA if asked." *Id.* at 73, 78, 80-81.

With respect to necessity, the Court notes that Heu's declaration does *not* dispute that he and Chan were friends, nor does Heu state that he would have been willing to testify about Chan. Instead, Heu's declaration simply states, "I never told Detective Shavers I would not cooperate with him . . . ." Def's Ex. H at 3. Further, Heu's declaration does not state that he possessed information about Chan's co-conspirators or that he would be able to provide the government with information that would reveal the hierarchy and full scope of the conspiracy; indeed, Heu's declaration carefully states that he never offered or provided information regarding Chan's involvement with growing or distributing marijuana except for medical marijuana. *See generally id.* Thus, even assuming Heu was willing to testify against Chan, by the very terms of Heu's October 22, 2005 declaration, he likely would not have provided much information.

Defendant also suggests that Fay committed *Franks* error by omitting the fact that CS#3 made unrecorded calls to Chan prior to making the telephonic introduction of Shavers. Defendant contends that these contacts show that if CS#3 had intended to disclose the investigation, he would have done so in these early calls. Thus, defendant argues, Fay lied by stating in his affidavit that the government was concerned that further use of CS#3 would compromise the investigation. However, Fay's affidavit did disclose that there were ongoing contacts between CS#3 and Chan on an approximately weekly basis between January 2005 and March 2005. *See* Fay Aff. at 64. Thus, Judge Patel knew that Chan and CS#3 were in regular contact when she approved the wiretap application and order. Defendant has

18

1    failed to establish any *Franks* violation.

2

3                **(3)    Misstatements regarding the usefulness of physical surveillance**

4           Defendant also contends that Fay's affidavit mischaracterizes the usefulness of physical

5    surveillance.  Defendant argues that the affidavit de-emphasizes instances of successful surveillance

6    conducted against Chan and instead focuses on instances that tend to disparage the use of surveillance.

7    Defendant notes that the affidavit never cites any instances of surveillance that actually failed.

8           The Court concludes that Fay's affidavit provided a balanced view of the limits and value of

9    physical surveillance.  The affidavit states, in relevant part:

10          204.    Physical surveillance has been attempted on numerous occasions during this
            investigation.  Although it has proven valuable in identifying some activities and
11          associates of Vince Ming WAN and locations where criminal activity may be taking
            place, physical surveillance, if not used in conjunction with electronic surveillance, is
12          of only limited value.  Unless the surveilling agents are able to approach very close to
            the subjects, physical surveillance does not provide content of discussions, nor generally
13          does it provide direct evidence of criminal activity undertaken out of direct view of the
            surveilling agents.
14
            205.    Physical surveillance of various of the Anticipated Interceptees and Additional
15          Targets has been conducted on multiple occasions.  In general, this surveillance has
            confirmed CS statements that various of the Anticipated Interceptees and Additional
16          Targets are associated with one another; has revealed the locations of the residences and
            meeting places of various of the Anticipated Interceptees and Additional Targets; and
17          has led to the identification of various locations which are suspected to be operating
            marijuana grow sites.
18
     Fay Aff. at 113.  Fay described surveillance conducted on June 1, 2004, July 27, 2004 and March 11,
19
     2005, as well as the use of pole cameras at several businesses.  *Id.* at 113-18.  Fay noted specific
20
     limitations of each instance of surveillance, noting, for example, that at one point on July 27, 2004,
21
     agents lost Chan in heavy traffic, then observed him in front of his residence unloading boxes, and that
22
     as a surveilling agent drove by, "CHAN turned around and watched the agent's vehicle and continued
23
     to do so until the agent was several blocks away."  *Id.* at 115.  Defendant does not point to any
24
     information that was omitted from the affidavit, and fails to explain how physical surveillance would
25
     have added more to the agents' knowledge than what the affidavit already said it had.
26

27

28               **(4)    Misstatements regarding the potential effectiveness of the engagement of
                 potential interviewees in investigative interviews**

United States District Court
For the Northern District of California

1    Defendant contends that the affidavit's assertion that there is no potential interviewee who could

2    be contacted "without compromising the investigation," *id.* at 109, is contradicted by the affidavit's own

3    recitation of the arrest of Chieh Shih Ho, who was arrested at a grow site in San Francisco. *Id.* at 45.

4    Citing information contained in Fay's affidavit, defendant argues that "it is clear" that Ho would at least

5    be able, and possibly willing, to provide information disassociating himself from the alleged conspiracy.

6    According to the affidavit, on October 11, 2004, firefighters from the San Francisco Fire

7    Department discovered a clandestine indoor marijuana cultivation facility in a residence located at 565

8    Arguello Street, San Francisco, while investigating the report of a water leak within the residence.

9    Officers from the San Francisco Police Department responded to the scene, seized 561 growing

10   marijuana plants, and arrested Ho at the scene.  Ho claimed to be a medical marijuana caregiver.

11   Pen register data showed that Chan was in contact with a telephone number subscribed in HO's

12   name.  Officers attempted to interview Ho at the scene of his arrest.  Ho would only state that it was his

13   address, that he signed a one-year lease in November 2003, and that he was paying $2500 per month

14   in rent.  After police read Ho his *Miranda* rights, he asked for counsel.  Fay's affidavit states that no

15   further attempts to interview Ho have been made.  Fay states, "Based on my knowledge of the facts and

16   circumstances of this investigation, including the limited scope of HO's statement at his arrest and his

17   claim to be a 'medical marijuana caregiver,' I believe that the risks of compromising this investigation

18   by making any further attempt to interview HO about the activities of the Vince Ming WAN DTO

19   outweigh the likelihood that he could, and would be willing to, provide information about the conspiracy

20   and its activities." *Id.* at 46.

21   The Court concludes that defendant has failed to demonstrate a *Franks* violation.  Again,

22   defendant does not point to any information that the government withheld.  Instead, defendant cites

23   information *contained in the affidavit and presented to Judge Patel* to argue that a wiretap was

24   unnecessary.  Defendant's argument is based on pure speculation, and the Court finds that the affidavit

25   sufficiently explains why further interviewing of Ho would likely be of limited value and could expose

26

27    the investigation.  In any event, the government was not required to exhaust every possible investigative

28   technique prior to seeking a wiretap.  *See Staves*, 383 F.3d at 982; *see also United States v. McGuire*,

20

1    307 F.3d 1192, 1196-97 (9th Cir. 2002).

2

3                 **(5)    Misstatements regarding the potential danger involved in carrying out
                           investigative techniques such as undercover nominee lessee placement,**
4                 **       money transportation, and buy-bust operations**

5          Defendant argues that the government overstated the dangers associated with certain

6    investigative techniques because there was no evidence that Chan was dangerous, and in fact, Chan had

7    assured the undercover agents on several occasions of his aversion to violence.  Specifically, defendant

8    challenges the affidavit's citation of (1) "safety and liability issues inherent in" the placement of an

9    undercover agent in the role of a nominee lessee for an alleged marijuana grow site; and (2) the

10   statement that a "bulk cash smuggling" operation to Canada would be "too risky to take up" since an

11   undercover agent was robbed at gunpoint with assault weapons in analogous operation involving a

12   money transfer operation in 2004.  Fay Aff. at 96-97.

13         With respect to the nominee lessee, the affidavit states:

14         Investigating agents considered trying to introduce an undercover agent to CHAN to act
           as such a nominee lessee.  After full discussion with the Office of the United States
15         Attorney, it was determined not to pursue such an undercover operation because of
           concerns about the ability of the government to safely monitor any resulting clandestine
16         marijuana cultivation sites (including protecting against damage or danger from fire,
           water, and chemical pollution), liability issues inherently posed by the need to maintain
17         the integrity of the investigation (as opposed to notifying any affected landlord or
           property management company of the real facts), and the obvious problem of having the
18         government become too closely involved in the criminal activity under investigation.

19   *Id.* at 74.  These are the "safety and liability" issues referenced in the portion of the affidavit quoted by

20   defendant; these issues have nothing to do with Chan's propensity or lack thereof for violence.  As the

21   government notes, defendant does not assert that the government omitted or misrepresented any

22   information in connection with the nominee lessee proposal.  The Court finds there is no *Franks*

23   violation, nor is there a basis for a hearing on this issue.

24         With respect to the cash smuggling proposal, the affidavit states:

25         130.    CHAN suggested that the undercover agents conduct this smuggling in the near
           future, and requested that the follow a specific protocol. CHAN's protocol required the
26         simultaneous exchange of the entire amount of cash at one location in the San Francisco
           Bay Area (the cash provided by CHAN) and at another location in Vancouver, Canada
27         (the cash to be exchanged for CHAN's cash).  Investigating agents considered having
           Detective Shavers accept this protocol but rejected the idea.  First, it would require the
28         government to put up at least $200,000 (a sum not easily obtained).  Second, it posed a

                                                   21

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> grave risk to the safety of the undercover agents (who might, for instance, be the targets of a robbery attempt).  Finally, any such operation would require extraordinary coordination with Canadian authorities (inasmuch as it would entail undertaking law enforcement operations in a foreign country).

Aff. at 72.

Relying on *United States v. Aileman*, 986 F. Supp. 1228 (N.D. Cal. 1997), Chan asserts that the government exaggerated fears that such an operation would pose a "grave risk to the safety of the undercover agents," and that such general fears of danger cannot form the basis for a finding of necessity.  In *Aileman*, the court held that "generic" recitations of the dangers posed by investigative techniques such as physical surveillance were fundamentally misleading when there was no specific basis for a belief that the defendant was actually dangerous. *See* 986 F. Supp. at 1285.  Chan argues that there was no basis for the government to believe that he was dangerous since he had professed on several occasions that he did not like violence.

Chan's argument misses the point for several reasons.  First, as Fay's affidavit states, the government decided against Chan's cash smuggling proposal not just because of the dangers it posed, but also because of the difficulty of obtaining $200,000 in cash, and the logistical difficulties inherent in coordinating with Canadian authorities.  Second, the Fay affidavit did not state that Chan posed a "grave risk" to the undercover agent, but rather that the operation was inherently risky because the participating agent could be the victim of an armed robbery.  As Agent Brown stated during the April 20, 2005 *in camera* proceeding before Judge Patel, Brown was personally aware of the armed robbery of undercover agents in a similar simultaneous money exchange on both sides of the United States/Canadian border, and thus the concerns about the dangers associated with such a transaction were not merely theoretical.  *See* April 20, 2005 RT at 7-9 (3119-21).

In sum, defendant has failed to establish a *Franks* violation or a basis for a *Franks* hearing.  To the extent that Chan contends that the Fay affidavit relied on boilerplate assertions of the necessity for a wiretap, those contentions are addressed in Section 2 *supra.*

**3.    Defendant Wan's Motion for Bill of Particulars**

At the hearing, AUSA Scoble stated that by the end of June 2006, the government intends to file

a superseding indictment that will provide considerably more specific information regarding the alleged conspiracy. As defendant Wan's motion for a bill of particulars argues, *inter alia*, that a bill of particulars is required because the current indictment is too general, the Court concludes it is prudent to DEFER ruling on Wan's motion until the superseding indictment is filed.

Accordingly, the directs the parties as follows: Within 7 days of the filing of the superseding indictment, defendant Wan may file a supplemental brief of no more than 5 pages regarding the impact of the superseding indictment on the pending motion. Within 7 days of the filing of Wan's supplemental brief, the government may file a response of no more than 5 pages. Upon the conclusion of supplemental briefing, the matter shall be deemed submitted.

## CONCLUSION

For the foregoing reasons and good cause shown, the Court hereby DENIES defendant Tam and Wong's motion to suppress evidence (Docket No. 312), DENIES defendant Chan's motion to suppress evidence (Docket No. 311), and DEFERS ruling on defendant Wan's motion for a bill of particulars. (Docket No. 310).

**IT IS SO ORDERED.**

Dated: June 5, 2006

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

23