United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>  v.<br><br>ENRIQUE CHAN, et al.,<br><br>        Defendants.<br>                                         / | No. C 05-0375 SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS SEARCH OF 226 IRVING ST. "APT. 5B"** |

On October 27, 2006, the Court heard oral argument on defendant Chan's motion to suppress the search of 226 Irving Street, San Francisco, California. In response to the Court's questioning at the hearing, on November 6, 2006, defendant filed a declaration describing his connection to the area searched and his expectation of privacy in that area. After consideration of the parties' papers, the Court concludes that Chan has standing to challenge the search, that the search of apartment 5B exceeded the scope of the warrant, and that the *Leon* good faith exception does not apply. Accordingly, for the reasons set forth below, the Court GRANTS defendant Chan's motion to suppress.[1]

### BACKGROUND

On June 20, 2005, Magistrate Judge Maria-Elena James issued a search warrant authorizing

---

[1] Defendants David Lee and Darrick Hom have joined in Chan's motion. Although the Court concludes that Chan has standing to challenge the search, neither Lee nor Hom has submitted any briefing or evidence to establish that he has standing to challenge the search and the Court finds that they do not.

the search of, *inter alia*, "226 Irving Street, Apt. #3, San Francisco, California."[2]  Chan Motion Ex. B. The "Description of Premises to be Searched" stated,

> 1. A residence used by Enrique CHAN, located at 226 Irving Street, San Francisco, California, San Francisco County. A three-story building, multi-family dwelling, lavender in color with dark purple trim, and a square top roof. Steps in front of the residence lead to two main doors, the door on the left has the numbers "226" clearly posted above the entrance door, in black numerics, while the door on the right is clearly marked "228." No apartment numbers are visible from the street. . . . There is also single garage door with both addresses (#226 & #228) posted above the door. To the right of the garage, on the ground level, is another entrance door with no visible markings. All of the doors face South.
>
> 2. The premises to be searched includes all rooms, attics, basements, containers, and other places therein, the surrounding grounds and any and all yards, garages or other places such as storage areas, trash containers, utility sheds and out buildings attached or detached, reasonably appearing to be under the control of Enrique CHAN and/or Iris Lai Hung TAM which may contain items of evidence sought in this search warrant. The premises to be searched shall also include any vehicles . . . .

*Id*.

The master affidavit submitted in support of the search warrant stated that while the other eleven locations to be searched were believed to be current residences of persons who had been indicted,

> The sole exception is location #2, 226 Irving Street, Apt. #3, San Francisco. As is described more fully below, this property is owned by Iris Lai Hung Tam and is used by Enrique CHAN as address of record with the California Department of Motor Vehicles. Evidence suggests that at least one other co-conspirator, Darrick Curtis HOM, has used 226 Irving Street as a mailing address. Further, there is probable cause to believe that [sic] used by CHAN for storage of equipment used in furtherance of his marijuana cultivation activities.

Fay Affidavit at 6246, attached as Exhibit B to Scoble Decl. The affidavit also stated,

> Enrique CHAN has no known employment. On a California Secretary of State record filed on February 2, 2001, Enrique CHAN alleges to be the registered agent of Millennium Bearings, LLC, a company located at 226 Irving Street in San Francisco. That business address is a residential property owned by CHAN's mother, Iris Lai Hung TAM. CHAN has used the 226 Irving Street address as the building address for a cellular telephone and as the shipping address for what is believed to be grow site equipment ordered from Canada. . . .

*Id.* at 6279.

Fay's affidavit stated that he believed Chan currently resided at 65 Anzavista Avenue, a

---

[2] The search warrant for 226 Irving St., Apt. #3 was one of a set of twelve search warrants for residences associated with indicted defendants, presented to Judge James as a group and based on a single "master" affidavit of Special Agent Christopher Fay. Scoble Decl. ¶¶ 2-3.

residence owned by Chan's maternal uncle. *Id.* at 6286-87. Fay also noted that when Chan was arrested at a marijuana grow site on December1, 2004, he listed his address as "226 Irving Street, San Francisco," without a specific apartment number. *Id.* at 6287, 6291. Finally, Fay stated that as of three days before the search warrant application, California DMV records confirmed that 226 Irving Street, Apt. 3 was the address of record for Chan; that Chan had listed 226 Irving Street, Apt. 3 as his billing address for the target telephone; and that as of June 9, 2005, San Francisco county records confirmed that Iris Tam was "the owner of record for the residential property located at 226 Irving Street, San Francisco." *Id.* at 6290.

On June 22, 2005, federal and state officers executed the search warrant at 226 Irving. Officers first went to apartment #3, which had no number on the door,[3] where they encountered a family who was residing in the apartment: Kirandeep Panatch, her husband Manoranjan Panatch, their 15-month old daughter, and a pet dog. Zirkelbach Decl. ¶ 4. After initially detaining and handcuffing one or both of the Panatches, the agents determined that they had been tenants in apartment #3 since approximately December 2004. Crowe Decl. ¶ 2.

The Panatches told agents that Iris Tam owned the building, and that they mailed rent payments to her. *Id.* ¶ 3. The Panatches told agents that they initially dealt with Enrique Chan when viewing the apartment and signing their lease, and Chan had supposedly told them to call him if they needed anything for the unit they were renting. *Id.* The Panatches also stated that Chan told them that he had previously lived in apartment #3, that he continued to receive mail there, that the Panatches would store the mail for him, and that he would periodically come by to pick up his mail. *Id.*; *see also* Panatch Decl. ¶ 3. The Panatches told agents that Chan had keys to the entire building, and that Chan told the Panatches that he was renovating the downstairs (street level) portion of the building. *Id.*; *see also* Panatch Decl. ¶ 4 (stating that packages arrived and that "I assumed that the packages were for renovation for the ground floor apartment that he said was going to be renovated."). Panatch states in her declaration that the agents asked whether she and her husband were aware of any storage areas in

---

[3] *See* Panatch Decl. ¶¶ 6-7 (stating that while tenant lived at apartment #3 from December 2004 until August 2006, the unit was never marked with a number "3," that other units never had a number on them, and that one unit was marked with a number "8").

3

the building, and that "My husband and I informed them that 'we do not know of any storage area in the building.'" Panatch Decl. ¶ 4.[4]

Agents seized mail from apartment #3 addressed to defendants Chan and Tam pursuant to the search warrant. Chan's motion does not challenge the search of apartment #3, nor the seizure of the mail from that apartment. Instead, Chan's motion concerns the agents' search and seizure of items from a unit located off of the garage, referred to as apartment #5B by Chan, and as a vacant basement in-law unit, or storage area, by the government.

While certain agents interviewed the Panatches, other agents secured the building and searched for common spaces and basement storage areas. Parry Decl. ¶ 5; *see also* Exhibits to Parry Decl. (pictures of the exterior and interior of 226 Irving St.) According to the government, officers looked through a window from the back yard and observed what appeared to be a vacant space with an open box full of items on the floor. *Id.* The officers contacted SFPD Lieutenant Parry, who was helping oversee the SFPD officers executing the warrant (and who was upstairs in apartment #3 during the interview of the Panatches) and asked him whether the area they observed was searchable under the search warrant since it appeared to be a storage area. *Id.* Parry states,

> At this point I joined my officers in the basement. From them I learned that they could see through a back window into what appeared to be a vacant area which was being used for storage. I verified this myself. Some items, including an open cardboard box with things in it, were visible from the window. I ascertained that the door to this area was in the "breeze way" parking area, visible in Exhibit F beyond and to the right of the parked vehicle. The door was locked. We knocked and announced at it, but got no answer. As I recall, this door had no number on it. I believe it would have affected my decision making if the door had a number, because that would have raised an issue in my mind as to whether this space was an independent living space as opposed to storage. . . .
>
> Also, thinking that this area might be linked to a possible ground-floor unit accessed through the street-level door described above as situated to the right of the garage doors, we knocked on that door. . . . We got no response. . . .
>
> It should be pointed out that at this point, it was unclear whether this area was a "unit"; we could tell that it was vacant and used for storage, but only later – after making entry – did we ascertain that there was a kitchen and bathroom in there, which then suggested that this was a vacant "in law" unit unoccupied at the present time.

---

[4] The "Memorandum of Interview" prepared by Special Agents Crowe and Iglesias states, "KIRANDEEP and MANORANJAN [Panatch] do not know if CHAN uses the garage for storage." Crowe Decl., Ex. A ¶ 11.

4

> Nobody had yet made entry into this vacant basement storage area. I concluded that this area was not a residence but rather was a storage area within the control of Enrique Chan and/or his mother, Iris Tam.
>
> As noted above, the door into the unit from the parking area was locked. Rather than force entry, we checked the open back window through which officers had already looked into the unit. It was found to be unlocked, so Officer Kasper climbed through it and came to unlock the door leading in from the cement parking apron.

*Id.* ¶¶ 7(a)-(c), 8.

Once the officers entered the unit, they discovered a kitchen and bathroom, several plastic bags full of clothes, and an open cardboard box containing, *inter alia*, a laptop computer with a memory stick, receipts, invoices and other documents pertaining to marijuana cultivation. *Id.* ¶¶ 8-9. Parry states that there was no furniture in the unit, and that there were no signs of recent habitation, such as food or food wrappings (Parry also states that he believes the refrigerator had an "Energy Saver" sticker on it). *Id.* ¶ 8. Officers seized the cardboard box and its contents. *Id.* ¶ 9.

## DISCUSSION

Defendant Chan moves to suppress evidence obtained from 226 Irving #5B on the ground that the search warrant's description was insufficiently particular, and alternatively, even if the search warrant is not facially invalid, that there was no probable cause to search the separate unit of #5B. The government challenges both of these contentions, and also raises the threshold issue of whether Chan has standing to challenge the search.

### 1.     Standing

The government contends that Chan fails to establish his standing to challenge the search of 226 Irving St. Whether a defendant has standing to contest the legality of a search presents a mixed question of fact and law. *See United States v. Singleton*, 987 F.3d 1444, 1447 (9th Cir. 1993). A defendant has standing to challenge the legality of a search on Fourth Amendment grounds only if he has a "legitimate expectation of privacy" in the place searched. *See Rakas v. Illinois*, 439 U.S. 128, 148 (1978). The defendant bears the burden of establishing his legitimate expectation of privacy. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

5

Although defendant did not address standing in his motion, defendant filed a declaration on November 6, 2006, in an effort to show that he had a reasonable expectation of privacy in apartment 5B. Chan states the following: his mother owns the building; on approximately March 15, 2004, his mother gave him "sole possession and permission" to use apartment 5B; between March 15, 2004 and June 22, 2005, he stored many of his personal belongings in apartment 5B because he believed no one else would have access to that unit; between the same time period he was the only person with a key to that location and was in exclusive possession and control of apartment 5B; he slept in apartment 5B; and he had an expectation of privacy in apartment 5B. *See* Chan Decl. ¶¶ 2-7. Chan's declaration does not state how often he visited or slept in apartment 5B.

The Court concludes that Chan has standing to challenge the search. The Supreme Court has held an overnight guest has a reasonable expectation of privacy in a friend's residence even though he has no legal interest in the premises and does not have legal authority to determine who may enter the household. *See Minnesota v. Olson*, 495 U.S. 91, 96, 98 (1990); *see also United States v. Gamez-Orduno*, 235 F.3d 453, 458-61 (9th Cir. 2000) (marijuana smugglers who stayed overnight in trailer home with owner's permission, free of charge, for purpose of eating and resting, had expectation of privacy to challenge search of trailer). The Ninth Circuit has held that a defendant had standing to challenge the search of a locked safe he kept at a friend's house. *See United States v. Davis*, 932 F.2d 752, 757 (9th Cir. 1991). The *Davis* court noted that the defendant had a key to the friend's apartment, could come and go as he pleased, stored items at the apartment, took the precaution of storing items in a locked safe to assure privacy. The court also found it significant that the defendant paid at least some portion of the friend's rent. *Id.*

Here, although Chan did not pay rent for apartment 5B, his declaration states that his mother gave him sole possession and permission to use the unit, and he was the only person with a key to that location. Thus, Chan's expectation of privacy in apartment 5B is arguably stronger than that of the defendant in *Davis*, or the overnight guests in *Olson* or *Gamez-Orduno*. Chan stored belongings in apartment 5B, and states that he slept in the apartment. The record shows that the door to the unit was locked, and in order to gain entry officers were required to crawl through an unlocked window. These facts persuade the Court that, viewing the totality of the circumstances, Chan had a reasonable

6

expectation of privacy in apartment 5B. *See Davis*, 932 F.2d at 757; *see also id.* (*citing with approval United States v. Harwood*, 470 F.2d 322, 325-26 (2d Cir. 1972) (defendant had standing to challenge search of friend's garage where friend granted defendant permission to store containers, defendant permitted to "come and go" to check on belongings, and in fact checked on belongings)).

### 2. Facial Validity

Chan first contends that the search warrant was facially invalid because the broad description of the place to be searched created a reasonable probability that another premises would be searched. A warrant satisfies the particularity requirement if "the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended." *Steele v. United States No.1*, 267 U.S. 498, 503 (1925). The test for determining the validity of a warrant is whether the warrant describes the place to be searched with "sufficient particularity to enable law enforcement officers to locate and identify the premises with reasonable effort," and whether any reasonable probability exists that the officers may mistakenly search another premise. *United States v. Turner*, 770 F.2d 1508, 1510 (9th Cir. 1985). A warrant must be "specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized"; one factor to consider in evaluating whether a warrant's description is sufficiently precise is "whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not." *United States v. Mann*, 389 F.3d 869, 877, 879 (9th Cir. 2004) (rejecting argument that warrant authorizing search of "any tents, camping equipment, backpacks, etc." invested agents with too much discretion).

Defendant Chan argues that although the warrant was specific enough to allow officers to locate apartment 3, it was overbroad in that it seems to authorize officers to search "other places" not under the exclusive control of Chan or Tam. He contends that in this instance, there were no objective criteria to guide law enforcement officers as to how they were supposed to determine what areas "reasonably appear to be under the control" of Chan and/or Tam. This is especially problematic given that neither Chan nor Tam lived in the building, that Tam owned the building, and that the building was a multi-family residence.

The Court concludes that although it is a close question, the search warrant was not facially invalid. The warrant described a number of specific types of rooms and locations expected to be found at 226 Irving Street. However, as discussed *infra*, the Court concludes that agents exceeded the scope of the search authorized by the warrant.

### 3. The Search Exceeded the Scope of the Warrant

Chan contends that even if the search warrant was facially valid, officers exceeded its scope when they searched apartment 5B because no independent probable cause determination had been made by Judge James for that unit, and there was no basis for the officers to believe that apartment 5B was an area under the control of Chan or Tam. The government contends that the officers acted within the scope of the warrant because they believed apartment 5B was a "storage area" reasonably under the control of Chan.[5]

"Whether a search exceeds the scope of a search warrant is an issue we determine through an objective assessment of the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search." *United States v. Hitchcock*, 286 F.3d 1064, 1071 (9th Cir. 2002); *see also United States v. Rettig*, 589 F.2d 418, 423 (9th Cir.1978) ("In determining whether or not a search is confined to its lawful scope, it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution.").

Here, after examining the circumstances surrounding the issuance of the warrant, the contents of the search warrant, and the circumstances of the search, the Court concludes that the search of

---

[5] The government challenges Chan's assertion that the unit is in fact "apartment 5B." However, as stated *supra*, the Court finds that Chan's November 6, 2006 declaration demonstrates that he had a reasonable expectation of privacy in this location, which he describes as "apartment 5B." Moreover, the physical description of the location, which contains a kitchen and bathroom, belies the government's assertion that this space is a "storage area." The government has not submitted any evidence to rebut Chan's assertion that the unit is apartment 5B. In addition, the Mermer and Panatch declarations – which were submitted by the government – provide evidence that the space is a rental unit. A current tenant, James Mermer, has submitted a declaration stating that he has lived in the building in Apt. #2 since 1990 or 1991, and that over the years the "back room on the basement level" (Apt. 5B) has been occupied and sometimes not, and that he is not sure of specific dates. That unit is currently occupied. Mermer Decl. ¶¶ 1-3. Panatch states in her declaration that Tam rented out that unit after the June 2005 search, and between December 2004 when she moved into Apt. 3, until the date after the June 2005 search when Tam rented out the unit, she never saw anyone enter or exit that unit. Panatch Decl. ¶ 6 (Oct. 19, 2006 clarified version).

8

apartment 5B exceeded the scope of the warrant because there was no objective basis for believing that the area was under the control of Tam or Chan. The search warrant affidavit states that 226 Irving Street is a multi-family dwelling, that Tam owned the building, that Tam and Chan resided at other locations, and that Chan had listed his address at various times as "226 Irving Street Apt. 3," and at that address without an apartment number. When officers executed the search, they discovered that the Panatches were tenants of apartment 3, and that Chan received mail at apartment 3. According to the Panatch and Crowe declarations, the Panatches told officers they were not aware of any storage areas in the building, that Chan told them he was renovating the downstairs portion of the building, and that Chan had keys to the entire building and acted as a property manager.

Thus, based upon the search of apartment 3 and the information obtained from the Panatches, there was no basis to conclude that a locked room – much less a rental unit – located off of the garage, containing some personal items, was an area controlled by either Tam or Chan. The facts that Tam owned the building, and that officers understood from the Panatches that Chan had keys to the units in the building, are not sufficient to authorize officers to search every part of that building. *See United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980). Officers still needed some objective basis to believe that the area they were searching was a storage area controlled by Tam or Chan. At the very least, once officers crawled through the window and saw the kitchen, bathroom, and bags of clothes, they should have understood that they were not in a storage room, and likely were in another rental unit. Once inside the unit, there was no basis for concluding that the unit was occupied and/or controlled by Chan or Tam, as opposed to some other individual.[6]

The United States argues that the evidence from the search need not be suppressed under the exclusionary rule if officers honestly, and in "good faith," believed that the warrant being executed was valid under *United States v. Leon*, 468 U.S. 891 (1984). The question is limited "to the objectively ascertainable question whether a reasonably well trained officer would have known the search was illegal despite the magistrate's authorization." *See Leon*, 468 U.S. at 922. *Leon* does not apply and

---

[6] The government also emphasizes that the unit appeared to be vacant. However, even if that is true, that fact does not support the agents' conclusion that the unit was an area under the control of Chan, and indeed would seem to undercut any such conclusion.

9

1 suppression of the evidence is appropriate when the officers could not have "harbored an objectively 2 reasonable belief that probable cause existed." *Id*. at 923-24. The government bears the burden of 3 proving that reliance upon the warrant was objectively reasonable. *See United States v. Kow*, 58 F.3d 4 423, 428 (9th Cir. 1995).

5 Here, for all of the reasons stated *supra*, the Court concludes that reasonably well trained officers 6 would have known that they were exceeding the scope of the search warrant, at least at the point when 7 officers saw that the "storage area" had a kitchen, bathroom, and bags of clothes on the floor. At that 8 point, the officers could no longer harbor a good faith belief that the warrant authorized the search of 9 that area. The only rental unit for which a probable cause determination had been made was apartment 10 3; no other rental unit in the building was covered by the warrant. Accordingly, once officers crawled 11 through the window and saw the kitchen, bathroom and clothes in bags, they had an objective basis for 12 concluding that they were, in fact, in another rental unit. Indeed, Parry admits as much in his 13 declaration. *See* Parry Decl. ¶ 7(b) ("It should be pointed out that at this point [prior to entering the 14 unit], it was unclear whether this area was a 'unit'; we could tell that it was vacant and used for storage, 15 but only later – after making entry – did we ascertain that there was a kitchen and a bathroom in there, 16 which then suggested that this was a vacant 'in law' unit unoccupied at [the] present time.").

17 The Court concludes that a reasonably well trained officer would have known the search of that 18 unit was not covered by the search warrant, and that any search would require a separate warrant. 19 Accordingly, the Court concludes that the *Leon* good faith exception does not apply.

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS defendant Chan's motion to suppress evidence seized from 226 Irving Street, Apt. 5B, San Francisco, California. (Docket No. 429).

**IT IS SO ORDERED.**

Dated: November 14, 2006

SUSAN ILLSTON
United States District Judge