**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 05-375 SI |
| Plaintiff, | **ORDER GRANTING DEFENDANT PARK'S MOTION TO SUPPRESS CELL PHONE SEARCH** |
| v. | |
| EDWARD PARK, et al., | |
| Defendants. | |

On October 27, 2006 and February 2, 2007, the Court heard argument on defendant Park's motion to suppress the warrantless search of his cellular phone.[1] After careful consideration of the parties' arguments, the Court GRANTS the motion.

In sum, the Court finds the government has not met its burden to show that any exception to the warrant requirement applies. As an initial matter, the Court notes that the record is ambiguous, and somewhat conflicted, regarding exactly when and how officers searched defendants' cellular phones. It is clear, however, that the station house searches of defendants' cellular phones occurred approximately an hour and a half after their arrests, and thus were not roughly contemporaneous with the arrests. Under these circumstances, such delayed searches would be lawful if they are considered "searches of the person," as opposed to "searches of possessions within an arrestee's immediate control." *United States v. Chadwick*, 433 U.S. 1, 16 n.10 (1977). The Court finds that a modern cellular phone, which is capable of storing immense amounts of highly personal information, is properly

---

[1] Co-defendants Brian Ly, David Lee and Darrick Hom have joined in the motion. Defendants Ly and Lee were arrested along with Park, and all three had cell phones searched that day under similar circumstances. However, defendant Hom was not present or arrested, and did not have a cell phone searched. Thus, defendant Hom does not have standing to join the instant motion.

1 considered a "possession within an arrestee's immediate control" rather than as an element of the
2 person. As such, the Court concludes that once officers seized defendants' cellular phones at the station
3 house, they were required to obtain a warrant to conduct the searches.

4       The Court further finds that the searches were not "booking searches" because the government
5 has admitted that the searches were "surreptitious" and investigatory, and the government has not
6 demonstrated that the searches were conducted pursuant to standard police department procedures.

**BACKGROUND**

9       On December 1, 2004, San Francisco Police Inspectors John Keane, David Martinovich, Martin
10 Halloran, Ted Mullin, Officer Gary Watts and several narcotics officers executed a search warrant at
11 922 Capitol Street in San Francisco. *See* Keane Decl., Ex. 1 (Narrative of Police Incident Report). The
12 search warrant authorized the search of defendant Asa Lee Barnla and of 922 Capitol Street, San
13 Francisco, California.

14       Prior to executing the search warrant, the officers set up surveillance of 922 Capitol Street. *Id*.
15 Officers saw defendant Enrique Chan enter 922 Capitol Street, and then leave with a large bag and box;
16 he was detained after driving away. *Id*. While Chan was detained, defendants Park and Ly arrived at
17 922 Capitol Street and went inside. *Id*. Next, officers observed defendant Chi Hac drive up, park
18 outside 922 Capitol, look towards Officers Keane and Martinovich, and then drive away. *Id*. Officers
19 detained Hac. *Id*. Officers then saw defendant David Lee exit 922 Capitol Street; he too was detained
20 pending service of the search warrant. *Id*. Finally, officers saw Park and Ly leave 922 Capitol Street
21 and return to their vehicle; they also were detained pending service of the search warrant. *Id*.

22       The officers then executed the search warrant at 922 Capitol Street. *Id*. Officers found evidence
23 of an indoor marijuana cultivation operation, and they seized marijuana, growth medium, mail, and
24 equipment used to grow marijuana. *Id*. The officers arrested Park, Chan, Ly, Lee, and Barnla. *Id*.[2] The
25 "Field Arrest Cards" for Park and Ly state that they were arrested at 5:00 p.m., and the card for Lee
26 states that he was arrested at 5:05 p.m. *See* Supp. Mullin Decl., Ex. 1. No officers seized or searched

---

[2] Keane states that Hac was detained but later released at Taraval Station pursuant to California Penal Code Section 849(b) for lack of evidence to arrest. *Id*. ¶ 6.

any of defendants' cellular phones at the time of their arrests. *Id.* ¶¶ 4, 9; Supp. Halloran Decl. ¶¶ 5-7; Supp. Watts Decl. ¶¶ 4, 6.

After defendants were arrested, they were transported to Taraval Police Station for booking. *Id.* ¶ 5. Officer Watts and Inspector Mullin have submitted declarations stating that when Park, Ly and Lee were booked, their property, including cell phones, was removed from them and placed into envelopes for safe keeping pursuant to standard SFPD booking procedures. *See* Watts Decl. ¶ 7; Supp. Mullins Decl. ¶ 7. Watts describes those procedures as follows:

> Once at the Booking Counter, the Booking Officer, who records and takes an arrested person's property, obtains information about the arrested person and their arrest from the Searching or Arresting Officer. Information, including the arrested person's name, address, place of arrest, criminal charges, name and star numbers of the arresting and searching officers, the date, place, and time of booking, and the personal property taken from the arrested individual, is obtained and recorded on a SFPD Form 3800-09, otherwise known as a "Booking Form." . . .
>
> While at the Booking Counter, the Searching Officer removes or instructs the arrested person to remove all of his/her personal property and place the property on the Booking Counter. The Booking Officer then records on the Booking Form all of the personal property taken from the arrested person. Any property taken from the arrested person is then placed in an envelope.
>
> A copy of the Booking Form and a "Field Arrest Card" are attached to the outside of the envelope. The envelope is then taken for safe keeping for the arrested person by the Booking Officer. The envelope containing the arrested person's property will be transported along with the arrested person to the jail where the person will be held on the criminal charges underlying his/her arrest.
>
> At the Booking Counter, the Booking Form is normally signed by the Booking Officer, Searching Officer, and the arrested person, unless the arrested person refuses to sign the form. The arrested person's signature on the form is merely an acknowledgment that property was taken from them.

Watts Decl. ¶ 6(a), (c)-(e). Watts does not state that it was standard procedure to search the contents of cellular phones in connection with the booking process. Park, Ly and Lee all signed their respective Booking Forms. *See* Watts Decl. Ex. 1 (Park); Martinovich Decl. Ex. 2 (Ly); Supp. Mullin Decl. Ex. 2 (Lee).

The officers' declarations are vague, however, as to specific circumstances surrounding the searches of defendants' cellular phones. Inspector Martinovich searched Lee's phone, and at Martinovich's direction, Officer Halloran searched Park's and Ly's cell phones. Martinovich states,

> I believe that I requested that the cellular telephones of Chan, Lee, Barnla, Park and Ly be searched at Taraval station during the booking process. First, I know as noted above

3

> that standard SFPD booking procedure requires the inventorying of all personal property and the inspection of all containers in order to deter theft of arrestees' property and false claims of theft by arrestees, and to identify contraband and other dangerous items. Second, in my cases in the Narcotics Division, I often make sure that cellular telephones seized during booking are searched because they often contain evidence relevant to the investigation. In regards to this specific case, it was my belief that evidence of marijuana trafficking and/or cultivation might be found in each of the cellular telephones, especially since I had been investigating the marijuana trafficking and cultivation activities of Chan, Park, Lee and Barnla prior to their arrests on December 1, 2004. Moreover, based on my training and experience, I believed that a search of the cellular telephones at the police station during the booking process was permissible as a booking search.

December 22, 2006 Martinovich Decl. ¶ 6. Aside from this oblique reference by Martinovich, the government has not submitted any evidence that it is standard SFPD procedure to search the contents of cell phones as part of a booking search.

With respect to the search of Lee's cellular phone, Martinovich states,

> With specific regards to Lee, I searched his T-Mobile Sidekick II cellular telephone, having number 341-7908. I searched the address book of the cellular telephone and recorded the names and telephone numbers of individuals whose information appeared in the cellular telephone. Attached hereto as Exhibit 1 is an accurate and complete copy of the front and back side of the piece of paper containing the names and telephone numbers that I recovered from Lee's cellular telephone.
>
> I do not recall searching Lee's cellular telephone for "in-coming and out-going" calls. It is my general practice to record "in-coming and out-going" calls when I search an arrestee's cellular telephone. Given the fact that I made no notation of "in-coming and out-going" calls on Exhibit 1, I do not believe that I conducted such a search. I also do not recall searching the cellular telephone for information stored or accessed via the internet, or, for photographs, videos, calendars, email or text messages, or any other stored data.
>
> Lee's Booking Form, which is attached as Exhibit 2 to the Declaration of Ted Mullin . . . indicates that he was booked at 18:30 hours. I do not recall the specific time that I conducted the search of his cellular telephone and I did not note the time of the search on Exhibit 1 attached hereto. Nonetheless, I believe that I retrieved and searched his telephone before it was sealed in the property envelope and taken by the station Booking Officer for safe keeping for Lee because I did not have access to the cellular telephone thereafter.

*Id*. ¶¶ 7-9.

Halloran describes his search of Park's cell phone as follows:

> Specifically with regard to Park, I believe that he had a cell phone on his person at the time of his arrest. Following his arrest, but before his personal property was taken by the Booking Officer at Taraval Station for safe keeping for Park, I retrieved and searched Park's Verizon Wireless cell phone, having telephone number (415) 516-2771.
>
> I wrote down on a piece of paper the names and telephone numbers of individuals whose information appeared in Park's cell phone. Attached hereto as Exhibit 1, is an accurate

4

> and complete copy of the piece of paper containing the names and telephone numbers that I retrieved from Park's cell phone. On Exhibit 1, I also made the following notations: "12-01-04 @ CO I" and "18:44 hrs." The notation "12-01-04 @ CO I" is a reference to December 1, 2004; the date that I searched the cell phone. The notation "@ CO I" is a reference to Company I of Taraval Station; the place where the search was conducted. Lastly, "18:45 hrs" refers to the time when I searched the cell phone's memory.

Halloran Decl. ¶¶ 6-7. Halloran notes that although Park's Booking Form states that he was booked and his personal property was taken at "18:30 hours,"

> I believe that the booking time denoted on the form is actually an approximation of the time he was booked and his property was taken. I also believe that Park's personal property, including his cell phone, was taken by the Booking Officer after I searched the cell phone's memory at 18:45 hours (i.e. 6:45 p.m.). I believe this to be the case because I did not have access to Park's cell phone after it was placed in a property envelope and taken by the Booking Officer.

*Id.* ¶ 9.

> Finally, Halloran describes the search of Ly's cell phone as follows:
>
> Specifically with regard to Ly, before his personal property was taken by the station Booking Officer for safe keeping for Ly, I retrieved and searched his T-Mobile Sidekick II, having telephone number (415) 359-5011. . . .
>
> I do not recall the specific time that I searched Ly's cellular telephone and I did not note the time of the search on Exhibit 1 attached hereto. Moreover, I do not recall whether I searched Park's cellular telephone before Ly's or vice versa.
>
> Ly's Booking Form indicates that he was booked and his personal property taken at "18:30 hours" on December 1, 2004. . . I believe that the booking time noted on the form is an approximation of the time Ly was booked and his property was taken. I further believe that Ly's cellular telephone and other personal property were taken by the Booking Officer after I searched the cellular telephone. I believe this to be true because just as in the case of Park's cellular telephone, I did not have access to Ly's cellular phone after it was taken by the Booking Officer.

Supp. Halloran Decl. ¶¶ 10, 12-13.

The officers do not detail exactly how, or when, during the booking process they seized and searched defendants' cell phones. With regard to 6:30 p.m. "booking time" listed on the Booking Forms, Watts also states,

> I do not recall Park and Ly being processed at the Booking Center at the same time, nor do I recall them being processed at the Booking Center at the same time as Chan, Lee, or Barnla. I believe that all five individuals were processed one at a time. Moreover, I believe that there was some lapse in time between the booking of all five individuals because the other officers and I who processed their arrests and executed the search warrants were performing various tasks, such as: completing reports and other paperwork related to the search warrant and their arrests, searching the individuals at the Booking Counter, searching their cellular telephones, and/or processing evidence seized

5

pursuant to the search warrant at 922 Capitol Street.

Supp. Watts Decl. ¶ 7.

The confusion regarding exactly when and how defendants' cell phones were searched is exacerbated by the April 2005 affidavit by DEA Special Agent Christopher Fay. Fay submitted this affidavit to Judge Marilyn Hall Patel in support of a wiretap application, and the government previously filed the Fay Affidavit in opposition to a motion to suppress challenging the wiretap. In describing the December 1, 2004 arrest of defendants, Fay states,

> At the time of their arrests, Asa Lee BARNLA, Enrique CHAN, David LEE, Brian Heng Lun LY, and Edward Wook Sung PARK were all found to have cellular telephones on their persons. *These cellular telephones were seized and surreptitiously searched incident to the arrests, and were then returned to the owners*.

April 2005 Fay Aff. ¶ 75 (Docket No. 276, attached as Ex. A to Scoble Decl.) (emphasis added). The government's papers do not address Fay's statement, nor does the government attempt to reconcile the apparent discrepancy between Fay's description of the searches with the version contained in the officers' declarations.

## DISCUSSION

Defendants move to suppress the warrantless search and seizure of their cellular phones. The government defends the searches of the cellular phones on two bases. First, the government contends that officers lawfully searched the cell phones incident to defendants' arrests. Second, the government contends that the searches were lawful "booking searches." As set forth below, the Court finds that the government has not met its burden to establish that either exception to the warrant requirement applies.

**1.     Search Incident to Arrest**[3]

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. A search conducted without a warrant is "*per se* unreasonable . . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S.

---

[3] The government appears to concede that defendants have a reasonable expectation of privacy in their cell phones, and accordingly the Court does not address this issue.

6

218, 219 (1973) (citations omitted). The government bears the burden of establishing that a warrantless search was reasonable and did not violate the Fourth Amendment. *United States v. Carbajal,* 956 F.2d 924, 930 (9th Cir. 1992), *cert. denied*, 510 U.S. 900 (1993)(citations omitted).

A "search incident to arrest" is an exception to the general rule against warrantless searches. *See United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996). The justification for permitting a warrantless search is the need of law enforcement officers to seize weapons or other things which might be used to assault an officer or effect an escape, as well as the need to prevent the loss or destruction of evidence. *See id*. "A search incident to arrest must be conducted at about the same time as the arrest." *Id*. (citations and quotations omitted).

In *United States v. Edwards*, 415 U.S. 800, 815 (1974), the Supreme Court recognized an exception to the contemporaneity requirement and authorized the warrantless search of a suspect's clothes which occurred ten hours after the arrest at the police station house. In *Edwards*, the police took an arrestee's clothes to examine them for evidence of a crime. The court noted that the police had probable cause to believe the defendant's clothing was evidence, and held that taking such evidence "was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." *Id*. at 805.

In contrast, in *United States v. Chadwick*, 433 U.S. 1 (1977),[4] officers seized a locked footlocker at the time of an arrest and searched the locker approximately an hour later. The Supreme Court suppressed the search, reasoning:

> Warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

---

[4] *Chadwick* was abrogated on other grounds by *California v. Acevedo,* 500 U.S. 565 (1982) (overruling *Chadwick* as to containers within a vehicle and holding police may search a container within a vehicle without a warrant if they have probable cause to believe that the container itself holds contraband or evidence). *Chadwick*'s holding that a search incident to arrest must not be too remote in time or place is still good law.

7

*Id.* at 15 (internal citations and quotations omitted). The *Chadwick* court distinguished *Edwards* as follows, "[u]nlike searches of the person, *United States v. Robinson*, 414 U.S. 218 (1973); *United States v. Edwards*, 415 U.S. 800 (1974), searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest." *Id.* at 16 n.10 (internal citations omitted).[5]

After *Edwards* and *Chadwick*, courts evaluating delayed searches incident to arrest have distinguished between "searches of the person," such as the search of clothing in *Edwards* or the cigarette case in *Robinson*, and "searches of possessions within an arrestee's control," such as the footlocker in *Chadwick*. For example, in *United States v. Monclavo-Cruz*, 662 F.2d 1285 (9th Cir. 1981), a defendant was arrested in her car and an officer seized a purse that was either in her hand, on her lap, or on the car seat at the time of the arrest. The officer did not search the purse at the time of the arrest, but instead searched the purse approximately an hour later at the police station. The Ninth Circuit held that the search was not a valid search incident to arrest:

> We understand [*Chadwick*] to mean that once a person is lawfully seized and placed under arrest, she has a reduced expectation of privacy in her person. Thus, a search of a cigarette case on the person is lawful once the person is under arrest without reference to any possible danger to the police, *United States v. Robinson*, 414 U.S. 218 (1973); and the search of a person's clothes taken from him at the jail the day after his arrest is also lawful simply as reasonable jailhouse procedure. *United States v. Edwards*, *supra*. In reliance on this line of authority, we approved the warrantless search of an arrested person's wallet taken from his person. *United States v. Passaro*, 624 F.2d at 943; *United States v. Ziller*, 623 F.2d at 562-63. We find it significant that the *Passaro* court characterized the wallet of the arrested person as an "element of his clothing." *Passaro*, 624 F.2d at 944.
>
> Relying on *Passaro* and *Ziller*, the government contends that a purse on the lap at the time of arrest is much like a wallet in the pocket, and thus the warrantless search of the purse should be upheld. We disagree.
>
> Although we recognize that there is a fine line between a wallet on the person and a purse within an arrestee's immediate control, we hold that possessions within an arrestee's immediate control have fourth amendment protection at the station house unless the possession can be characterized as an element of the clothing, or another exception to the fourth amendment requirements applies. Monclavo-Cruz' purse, like a suitcase or briefcase in which a suspect has a fourth amendment interest at the station house, cannot be characterized as an element of her clothing or person, even if it were on her lap at the time of arrest. Although the officer had a right under *Belton* to search the purse taken from the car at the time of Monclavo-Cruz' arrest, we hold that the officer had no right to conduct a warrantless search of the purse at the station house.

---

[5] *Robinson* upheld the search of a cigarette case found on an arrestee.

8

*Id*. at 1291 (citations omitted).

Neither the Supreme Court nor the Ninth Circuit has addressed whether officers may search the contents of a cellular phone as a search incident to arrest, and the Court is aware of only one circuit court case on the issue, *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007). In *Finley*, officers arrested the defendant and a passenger in the defendant's car after effecting a traffic stop. Officers seized the defendant's cellular phone at the time of the arrest, and then transported the defendant to the passenger's residence; while at the residence, officers searched the call records and text messages on the defendant's cellular phone, and questioned him about those records and messages. The *Finley* court held that although the police had moved the defendant, the search was "still substantially contemporaneous with his arrest," and therefore permissible. *Id*. at 260 n.7. The court also held that "Finley's cell phone does not fit into the category of 'property not immediately associated with [his] person' because it was on his person at the time of arrest." *Id*. (*quoting Chadwick*, 433 U.S. at 15).

The facts in *Finley* differ slightly from the facts here, since in *Finley* the search of defendant's cell phone at the passenger's residence was "substantially contemporaneous" with defendant's arrest; here, the search of the cell phone was not contemporaneous with arrest. More fundamentally, however, this Court finds, unlike the *Finley* court, that for purposes of Fourth Amendment analysis cellular phones should be considered "possessions within an arrestee's immediate control" and not part of "the person." *Chadwick*, 433 U.S. at 16 n.10. This is so because modern cellular phones have the capacity for storing immense amounts of private information. Unlike pagers or address books, modern cell phones record incoming and outgoing calls, and can also contain address books, calendars, voice and text messages, email, video and pictures.[6] Individuals can store highly personal information on their cell phones, and can record their most private thoughts and conversations on their cell phones through email and text, voice and instant messages.

Any contrary holding could have far-ranging consequences. At the hearing, the government

---

[6] In this case, two of the searched phones were T-Mobile Sidekick IIs; in addition to address books, these phones feature e-mail accounts, text messaging, cameras, instant messenging, Internet capability, and video caller ID. The Court takes judicial notice of these features. *See* http://www.t-mobile.com/shop/phones/detail.aspx?tp=tb2&device=154e9bca-a74c-4299-99eb-48a1159c922b.

9

1 asserted that, although the officers here limited their searches to the phones' address books, the officers 2 could have searched any information – such as emails or messages – stored in the cell phones. In 3 addition, in recognition of the fact that the line between cell phones and personal computers has grown 4 increasingly blurry, the government also asserted that officers could lawfully seize and search an 5 arrestee's laptop computer as a warrantless search incident to arrest. As other courts have observed, 6 "the information contained in a laptop and in electronic storage devices renders a search of their 7 contents substantially more intrusive than a search of the contents of a lunchbox or other tangible object. 8 A laptop and its storage devices have the potential to contain vast amounts of information. People keep 9 all types of personal information on computers, including diaries, personal letters, medical information, 10 photos and financial records." *United States v. Arnold*, 454 F. Supp. 2d 999, 1004 (C.D. Cal. 2006).[7]

11 The searches at issue here go far beyond the original rationales for searches incident to arrest, 12 which were to remove weapons to ensure the safety of officers and bystanders, and the need to prevent 13 concealment or destruction of evidence. *See generally Chimel v. California*, 395 U.S. 752 (1969). 14 Inspector Martinovich stated that he initiated the searches because "evidence of marijuana trafficking 15 and/or cultivation might be found in each of the cellular telephones." Martinovich Decl. ¶ 6. Officers 16 did not search the phones out of a concern for officer safety, or to prevent the concealment or 17 destruction of evidence. Instead, the purpose was purely investigatory. Once the officers lawfully 18 seized defendants' cellular phones,[8] officers could have sought a warrant to search the contents of the 19 cellular phones.

20 The Court recognizes that subsequent cases have extended *Chimel*'s reach beyond its original 21 rationales. *See generally United States v. Thornton*, 541 U.S. 615, 624-35 (2004) (concurrences and

---

[7] In *Arnold*, District Judge Dean Pregerson held that a border search of the private and personal information stored on a traveler's computer hard drive or electronic storage devices is intrusive and therefore requires a heightened level of suspicion to be reasonable. Ordinarily, neither a warrant nor probable cause is required for ordinary searches of persons or things crossing the border. Judge Pregerson granted a motion to suppress such a search, and noted that "opening and viewing confidential computer files implicates dignity and privacy interests," and that "some may value the sanctity of private thoughts memorialized on a data storage device above physical privacy." *Id*. at 1003. The government has appealed this decision and the appeal is currently pending.

[8] There is no dispute that the officers lawfully seized the cellular phones as part of the booking process.

10

dissent discussing extension of *Chimel*). However, absent guidance to the contrary from the Ninth+ Circuit or the Supreme Court, this Court is unwilling to further extend this doctrine to authorize the warrantless search of the contents of a cellular phone – and to effectively permit the warrantless search of a wide range of electronic storage devices – as a "search incident to arrest." *Cf. id*. at 632 ("When officer safety or imminent evidence concealment or destruction is at issue, officers should not have to make fine judgments in the heat of the moment. But in the context of a general evidence-gathering search, the state interests that might justify any overbreadth are far less compelling.") (Scalia, J., concurring in the judgment).

In addition to *Finley*, the government cites a handful of unpublished cases upholding searches of cell phones, *see United States v. Brookes*, 2005 WL 1940124 (D.V.I. June 16, 2006), and *United States v. Cote*, 2005 WL 1323343 (N.D. Ill. May 26, 2006), as well as cases upholding searches of pagers. *See United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996); *United States v. Chan*, 830 F. Supp. 531, 534 (N.D. Cal. 1993). The Court finds that these cases are either not persuasive or are distinguishable. *Brookes* upheld the search of a cell phone as similar to a search of a pager in that both searches were "searches of a person." *Brookes*, 2005 WL 1940124 at *3. *Cote* upheld a cell phone search on the ground that cell phones, address books and wallets "would contain similar information." *Cote*, 2005 WL 1323343 at *6.

For the reasons stated *supra*, due to the quantity and quality of information that can be stored on a cellular phone, a cellular phone should not be characterized as an element of individual's clothing or person, but rather as a "possession[] within an arrestee's immediate control [that has] fourth amendment protection at the station house." *Monclavo-Cruz*, 662 F.2d at 1291.

The cases involving searches of pagers are distinguishable. The *Ortiz* court found that the search was necessary to prevent the destruction of evidence. *See Ortiz*, 84 F.3d at 984 ("Because of the finite nature of a pager's electronic memory, incoming pages may destroy currently stored telephone numbers in a pager's memory. The contents of some pagers also can be destroyed merely by turning off the power or touching a button."). Here, the government does not contend, and the record does not show, that the searches of defendants' cell phones were necessary to prevent the destruction of evidence. In *Chan*, officers seized and searched a pager within "only minutes" of the defendant's arrest, as opposed

11

to the more than hour and a half delay in this case. *See Chan*, 830 F. Supp. at 536. Further, the Court finds that the searches in *Ortiz* and *Chan* implicated significantly fewer privacy interests given the technological differences between pagers and modern cellular phones.

**2.     Booking search**

The government also defends the cell phone searches as "booking searches," which is a related but distinct exception to the warrant requirement. In *Illinois v. Lafayette*, 462 U.S. 640, 643-44 (1983), the Supreme Court upheld the warrantless search of a purse-type shoulder bag at the police station following the defendant's arrest. The court explained that this type of search is a form of inventory search which "is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration." *Id.* at 644. The court explained the legitimate governmental interests served by booking searches:

> A range of governmental interests support an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the stationhouse. A standardized procedure for making a list or inventory as soon as reasonable after reaching the stationhouse not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. Arrested persons have also been known to injure themselves – or others – with belts, knives, drugs or other items on their person while being detained. Dangerous instrumentalities – such as razor blades, bombs, or weapons – can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks – either while the items are in police possession or at the time they are returned to the arrestee upon his release. Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure.

*Id.* at 646. Booking searches must be performed pursuant to standardized criteria, *id.* at 648, and "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The Supreme Court has instructed that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.*; *see also United States v. Feldman*, 788 F.2d 544, 553 (9th Cir. 1986) ("An inventory search will not be sustained where the court believed that the officers were searching for incriminating evidence of other offenses.").

Here, the government has not submitted any police department guidelines or criteria showing that it is standard practice to search the contents of cellular phones as part of the booking procedure.

1  The government has submitted declarations from the officers involved in the arrest of defendants
2  describing "standard SFPD procedure"; as noted *supra*, however, the only declaration that specifically
3  discusses searching cellular phones is from Inspector Martinovich, who states,

> It is standard SFPD procedure to (1) obtain from the arrested person all personal property on his/her person and in his/her possession; (2) to have the personal property placed on the Booking Counter so that the items can be inspected and inventoried; and (3) to inspect any and all containers on or associated with the arrested person. This procedure avoids the risk of theft by police employees as well as false claims by arrested persons that their property was stolen by the SFPD. It also allows the searching officers to identify and seize contraband and items that would pose a danger to police or the arrested person. In my experience, it is also usual for the arresting officer(s) to assist in the process of removing and searching items of personal property and noting them for inventorying during the booking process. In my experience, this includes searches of wallets, address books, cellular telephones, back packs, and purses.

Martinovich Decl. ¶ 5.

The Court finds that the government has not met its burden to show, by a preponderance of the evidence, that it is standard police practice to search the contents of a cellular phone as part of the booking process. Martinovich's declaration, which states that it is his "experience" that such searches are routine, does not establish that such booking searches are "performed pursuant to standardized criteria," *Illinois*, 462 U.S. at 648, or that "[t]he policy or practice governing inventory searches should be designed to produce an inventory." *Florida*, 495 U.S. at 4. Further, the Court notes that the record belies the government's assertion that the searches of the cell phones here were conducted pursuant to "standard" booking procedures. DEA Special Agent Christopher Fay's April 2005 affidavit, submitted to Judge Patel in support of a wiretap application, states that defendants "cellular telephones were seized and *surreptitiously* searched incident to the arrests, and were then returned to the owners." April 2005 Fay Aff. ¶ 75 (Docket No. 276, attached as Ex. A to Scoble Decl.).

Indeed, the government has not articulated any reason why it is necessary to search the contents of a cell phone in order to fulfill any of the legitimate governmental interests served by a booking search: namely, to deter theft of arrestees' property and false claims of theft by arrestees, and to identify contraband and other items. As the Supreme Court has noted, the purpose of a booking search is to create an inventory of an arrestee's belongings; here, the officers could achieve this purpose simply by listing defendants' cell phones as items on the booking forms. Unlike other "closed containers," such as purses or bags which might contain contraband or weapons, there is no possibility that a cell phone

13

1 will contain any dangerous instrumentalities.

2 More importantly, the record demonstrates that the purpose of the search of the cell phones was investigative. Martinovich admits in his declaration that he directed the officers to search the cell phones because he believed that evidence of marijuana trafficking and/or cultivation might be found in the cellular telephones. The Court is not persuaded by Martinovich's rote recitation of other legitimate purposes of a booking search because, as discussed above, those legitimate interests have no applicability to a cell phone search.

The government cites *United States v. Diaz*, 2006 WL 319770 (N.D. Cal. Nov. 2, 2006) (Alsup, J.). In that case, Judge Alsup upheld a stationhouse search of a cell phone on the grounds that it was incident to booking and also authorized under the defendant's probationary search condition. However, *Diaz* is distinguishable because *Diaz* involved a probationary search. As Judge Alsup recognized, "[b]ecause probation is a form of criminal sanction, the probationer's reasonable expectation of privacy is diminished." *Id*. at *2.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS the motion to suppress. (Docket Nos. 477, 579 & 581). Because defendant Hom was not arrested and did not have a cellular phone searched, the Court DENIES Hom's joinder in Park's motion. (Docket No. 582).

**IT IS SO ORDERED.**

Dated: May 23, 2007

SUSAN ILLSTON
United States District Judge